DAVIDOFF HUTCHER & CITRON LLP
*Proposed Attorneys for the Debtors*
605 Third Avenue
New York, New York 10158
(212) 557-7200
Robert L. Rattet, Esq.
Jonathan S. Pasternak, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
In re:

| | |
|---|---|
| | Chapter 11 |
| F & O SCARSDALE LLC | Case Nos. 20-22808 |
| LUXURY DINING GROUP LLC | 20-22809 |
| FIG & OLIVE HOLDING LLC | 20-22810 |
| FIG & OLIVE USA INC. | 20-22811 |
| F&O LEXINGTON LLC | 20-22812 |
| FIG & OLIVE THIRTEEN STREET LLC | 20-22813 |
| FIG & OLIVE FIFTH AVENUE LLC | 20-22814 |
| F&O HOUSTON LLC | 20-22815 |
| F&O NEWPORT BEACH LLC | 20-22816 |
| F&O MELROSE PLACE INC. | 20-22817 |
| F&O LOS ANGELES INC., | 20-22818 |

                            Debtors.
-----------------------------------------------------------------X

**DECLARATION OF ALEXIS BLAIR PURSUANT TO LOCAL
BANKRUPTCY RULE 1007-2 AND 9077-1 IN SUPPORT OF A HEARING
ON SHORTENED NOTICE ON THE DEBTOR'S FIRST DAY MOTIONS**

ALEXIS BLAIR, under penalties of perjury, hereby declares and states as follows:

1. I am the CEO of each of the above captioned debtors (the "<u>Debtors</u>") and I submit this Declaration pursuant to Rule 1007-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York and pursuant to Local Rule 9077-1 in support of the Debtors' motions and applications filed substantially simultaneous with this Declaration (the "<u>First</u> <u>Day</u> <u>Motions</u>").

# PART I

# BACKGROUND

2. I have 10 years of experience in the restaurant industry in both operational and financial roles. In October 2014, I joined the company as the Food &Beverage Controller primarily overseeing cost controls and reporting for the organization. Over the years I was promoted throughout the organization and in September of 2019 assumed the role of Chief Executive Officer.

3. The Debtors were founded originally in 2003 by Laurent Halaz. In 2017, Guillaume Fonkenell became the majority owner of the Debtors following an equity transaction; and continues to be the majority owner. Mr. Fonkenell had been a member of the Debtors since 2006. FIG & OLIVE was founded as a French Mediterranean upscale casual restaurant group. FIG & OLIVE Lexington Inc was the first operating entity that opened in 2005.

4. Mr. Fonkenell has provided substantial capital and financing to the Debtors over the years; and the majority of the capital and financing since 2017.

5. From 2005 to 2018 FIG & OLIVE opened and currently operates 9 restaurants in 5 different markets across the US. In 2015, FIG & OLIVE opened its 8th location in Washington DC and shortly following the opening a Salmonella outbreak occurred in the DC and Melrose Place stores. The negative press triggered a downfall in revenue, and recoveries quickly depleted cash in the following months resulting in a transition of ownership to Guillaume Fonkenell. From 2017-2019, the company underwent a series of executive leadership changes as it worked to rebuild and stabilize. Since in or around 2015, and ongoing to today, the debtors have been plagued by lawsuits both related to the outbreak, as well as a series of frivolous employee law suits the settlement of which, have created a culture of copycat suits in CA and NY. Following

the most recent executive leadership change in mid-2019, the organization saw its best performance resulting in initial repayments of the loans financed by Mr. Fonkenell. In March 2020, a series of Stay at Home orders were put into place as a result of the COVID-19 pandemic crisis. During this time FIG & OLIVE was forced to close all operating units in compliance with civil mandates. To conserve cash during the closure period, over 700 employees were laid off or furloughed with only 34 employees remaining on staff at a reduced salary. After months of no receipts, and reopening restrictions forcing us to operate at reduced capacities in the 4 restaurants we have been able to resume some level of operating, FIG & OLIVE has depleted cash reserves. With the unknown timeline on when capacity restrictions will be lifted, and the impact the COVID-19 crisis will have on consumer behavior, FIG & OLIVE looks to restructure it's long term contractual obligations.

6. In order to meet current payroll and other critical and necessary operating expenses, the Debtors will require additional financing in the Chapter 11 cases. Mr. Fonkenell has agreed to provide such DIP financing on terms very favorable to the Debtors and their estates.

7. The Debtors intend to reorganize and not liquidate in the Chapter 11 proceedings by first rejecting certain or their restaurant premises leases as well as their headquarters lease, which leases are unprofitable and burdensome to the Debtors and their estates.

8. The Debtors then intend, with the assistance of Mr. Fonkenell's DIP financing, to resume operations, return to overall profitability, liquidate all disputed claims in a single forum – the bankruptcy court – and formulate and file a plan of reorganization within a reasonable amount of time.

9. The Debtors will utilize the Chapter 11 process to restructure their debt, seek out

new capital and liquidate the claims of the creditors so that a Plan of Reorganization can be filed within a reasonable amount of time. The Debtors are confident that proceeding in Chapter 11 is in the best interest of the Debtors, their estates and the creditors as a whole.

10. The needs and interests of the Debtors' creditors will best be served by the continued possession of their property and management of their affairs as debtors-in-possession under Chapter 11 until a restructuring plan can be formulated and presented to creditors.

## PART II

### INFORMATION REQUIRED BY LOCAL BANKRUTPCY RULE 1007

11. In addition to the foregoing, S.D.N.Y. Local Bankruptcy Rule 1007-2 requires certain information related to the Debtor, which is set forth below.

**Local Rule 1007-2(a)(1)**

12. The Debtors' headquarters are located at 254 West 31st Street, New York, New York. The Debtors operate 9 restaurants throughout the New York City, DC, Chicago, Houston and Los Angeles areas.

**Local Rule 1007-2(a)(2)**

13. This case was not originally commenced under Chapter 7 or 13 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*(the "Bankruptcy Code").

**Local Rule 1007-2(a)(3)**

14. Upon information and belief, no committee was organized prior to the order for relief in these Chapter 11 cases.

**Local Rule 1007-2(a)(4)**

15. A list of the names and addresses of the Debtors' 30 largest unsecured claims, excluding those who would not be entitled to vote at a creditors' meeting and creditors who are "insiders" as that term is defined in §101(31) of the Bankruptcy Code is annexed hereto as **Schedule I**.

**Local Rule 1007-2(a)(5)**

16. The Debtors have no secured creditors:.

**Local Rule 1007-2(a)(6)**

17. A summary of the Debtors' consolidated assets and liabilities is annexed hereto as **Schedule II.**

**Local Rule 1007-2(a)(7)**

18. There are no publicly held securities of the Debtors.

**Local Rule 1007-2(a)(8)**

19. None of the Debtors' property is in the possession of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditor, or any agent for such entity.

**Local Rule 1007-2(a)(9)**

20.    The Debtors lease, inter alia, the office space at 254 West 31st Street, 7th Floor, New York, New York, 10001 pursuant to a written lease agreement which expires on February 28, 2023.

**Local Rule 1007-2(a)(10)**

21.    The Debtors' books and records and substantial assets are located at the Debtors' headquarters at 254 West 31st Street, 7th Floor, New York, New York 10001.

**Local Rule 1007-2(a)(11)**

22.    Annexed hereto as **Schedule III** is a list of all outstanding litigation involving the Debtors.

**Local Rule 1007-2(a)(12)**

23.    The Debtors are currently managed by Alexis Blair, CEO and Laura Tribuno, COO.

**Local Rule 1007-2(b)(1) and (2)**

24.    The Debtors currently have 535 total employees; of which 87 are currently active and 448 are furloughed.

25.    The Debtors' estimated gross weekly payroll and payments to managers, members, and directors for the thirty (30) day period following the Chapter 11 petition is $5000.00.

26.    The Debtor's estimated payroll to non-manager/non-insider employees for the thirty (30) day period following the Chapter 11 petition is approximately $500,000.00..

**Local Rule 1007-2(b)(3)**

27.     A schedule, for the 30-day period following the filing of the chapter 11 petition, of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees is annexed as **Schedule IV**.

**PART III**

**AFFIDAVIT IN SUPPORT OF HEARING ON SHORTENED
NOTICE ON THE DEBTORS' FIRST DAY MOTIONS
PURSUANT TO LOCAL BANKRUPTCY RULE 9077**

28.     Contemporaneously with these Chapter 11 filings, the Debtors are filing a number of motions and applications (the "First Day Motions") as follows:

   i.    Debtors' Motion for Joint Administration of Chapter 11 Cases (the "Joint Admin Motion");

   ii.   Debtors' Motion To Pay Pre-Petition Wage Claims, Etc. (the "Critical Labor Motion");

   iii.  Debtors' Motion Seeking To Reject Certain Non-residential Commercial Leases (the "Rejection Motion");

   iv.   Debtors' Motion To Obtain Credit From Guillaume Fonkenell Pursuant to Section 364(b) of the Bankruptcy Code (the "DIP Motion");

   v.    Debtors' Motion Seeking to Continue Utilities (the "Utilities Motion");

   vi.   Debtors' Motion Seeking To Modify/Excuse Performance under Section 365(d)(3) of the Bankruptcy Code (the "365(d)(3) Motion");

   vii.  Debtors' Motion To Pay Taxes In Ordinary Course (the "Tax Motion");

   viii. Debtors' Motion to Continue Insurance Coverage Practices (the "Insurance Motion"); and

   ix.   Debtors' Motion to Continue Consolidated Cash Management System (the "Cash Management Motion").

29.     I submit that the relief requested in the First Day Motions should be heard and

determined on an expedited basis in order to allow the Debtor to continue its normal business operations without any interruption, which interruption that could severally detriment the Debtor's ability to successfully reorganize.

A.  <u>The Joint Admin Motion</u>

30. The Joint Admin Motion seeks the consolidation of the Chapter 11 cases for procedural purposes only.

31. This will allow the efficient and cost-effective administration of the Chapter 11 cases.

32. The Debtors have been operated as, essentially, a conglomerate with mostly common ownership, management and capitalization.

33. The Joint Admin Motion will help facilitate the effective and efficient administration of the Chapter 11 cases pending hopeful confirmation of a plan of reorganization.

B. <u>The Critical Labor Motion</u>

34. The Critical Labor Motion seeks authority to pay the pre-petition wages portion due to the Debtors' employees, together with the post-petition wages for that pay period on the next pay date, which is July 10, 2020.

35. The Debtors' employees are critical and necessary for the Debtors' ongoing operations and ability to continue to develop its software products. Should the Debtors be rendered unable to pay their employees their wages as scheduled, there would be irreparable harm caused to the employee morale and possible loss of employees. Should this happen, the Debtors' reorganization efforts would certainly be impaired.

36. The Debtors' employees are critical and necessary for the Debtors' ongoing operations. Should the Debtors be rendered unable to pay retain its employees, there would be

irreparable harm caused to the employee morale and possible loss of employees. Should this happen, the Debtors' reorganization efforts would certainly be impaired.

C.      The Rejection Motion

37.    The Debtors are also seeking the immediate rejection of 4 of their nonresidential commercial leases (the "Leases") which the Debtors have determined, in their business judgment, are burdensome to the estates and not necessary for the Debtor s' effective reorganization.

38.    Moreover, the Leases will have a negative impact on the Debtors' cash flow and hopeful future profitability and viability.

39.    Finally, the Leases have no net value to the estates.

40.    It is therefore necessary to immediately reject the Leases so as to not incur any post-petition liability to the respective subject landlords or utility providers. In addition, the Debtors' overhead will be reduced, giving the Debtors a better chance to achieve profitability and move towards ra reorganization.

41.    The Rejection Motion will create a streamlined procedure for adjudicating the landlords' claims so that the Debtors may further determine the universe of claims to be treated under a plan of reorganization.

D.      The DIP Motion

42.    The Debtors require post-petition financing in order to adequately fund continued operations in Chapter 11 until such time as a plan is filed and confirmed.

43.    Absent such authority, the Debtors' operations face potential cash flow shortages, causing irreparable harm to the estate.

44.    The successful outcome of the Chapter 11 cases is dependent upon the Debtors'

continued operations and use of DIP loan proceeds.

45. Mr. Fonkenell has agreed to provide DIP financing on extremely favorable and the least onerous terms a debtor can obtain in Chapter 11 under the Bankruptcy Code.

E. <u>The Utilities Motion</u>

46. The Debtors require continuation of their utilities in order to stay in operation.

47. In certain instances, the Debtors owe certain utilities for pre-petition services, and such utilities may otherwise seek to terminate services, which would have a detrimental effect on the Debtors and their hopes of reorganization.

48. In the Utilities Motion, the Debtors request that the Court prohibit the termination or cancellation of necessary utilities and in consideration therefore propose to provide such utility companies adequate assurance as required under Section 366 of the Bankruptcy Code.

F. <u>The 365(d)(3) Motion</u>

49. In light of the debtor's difficulties in re-opening operations due to ongoing COVID-19 restrictions and regulations, the Debtors request that they be excused from strict performance under Section 365(d)(3) of the Bankruptcy Code with respect to post-petition rent and related obligations to their landlords.

50. The Debtors propose to be permitted to pay only 25% of current monthly rent pending further determination by the Court or resolution with their landlords pending assumption or rejection of their remaining unexpired leases.

51. The Debtors simply cannot generate sufficient revenues to pay their full rent obligations for the foreseeable future due to the COVID-19 situation.

52. Without such relief, the Debtors may need to reject all of their unexpired leases, severely hampering and jeopardizing the Debtors' reorganization hopes and efforts.

53. I understand that there is recent precedent that would permit the Court to excuse complete compliance and reduce the rents as requested in the 365(d)(3) Motion.

G. The Tax Motion

54. The debtors request that they be permitted to pay their sales and use taxes on an ongoing ordinary course of business basis, even if the current tax period contains a portion of pre-petition taxes owed.

55. This will facilitate the acceptance of payment by the taxing authorities and reduce the amount of potential priority claims that must otherwise be paid in full under a plan of reorganization.

H. The Insurance Motion

56. The Debtors request that they be permitted to continue their insurance coverage practices, including the authorization to pay for insurance on a consolidated basis consistent with pre-petition practices to take advantage of economy of scale in pricing and coverage.

I. The Cash Management Motion

57. The Debtors request that they be permitted to continue certain consolidated cash management practices consistent with pre-petition course of operations, specifically with the Debtors' need to obtain DIP financing.

58. Historically, the Debtors were partially funded and/or capitalized by loans made by its majority owner, Guillaume Fonkenell, to the Debtors' parent, Luxury Dining Group LLC, which in turn would distribute such loan proceeds to the Debtor subsidiaries on an as needed basis to the extent that their own operational revenues were insufficient to carry all operating expenses.

59. In light of the operating Debtors' forecasted lack of revenues during the initial

11

Chapter 11 period, the Debtors will require DIP financing and seek to continue the consolidated cash management and funding practices that were in place prior to the Chapter 11 cases.

60.  This will provide for efficiency and less administrative burden during the Chapter 11 cases.

61.  Moreover, the Debtors will carefully account and report and intercompany transactions on their operating reports.

62.  Thus, for the foregoing reasons, I believe that good cause exists to have an emergency hearing on the First Day Motions which typically requires a minimum of twenty-one (21) days' notice as provided for in Federal Rule of Bankruptcy Procedure 2002 and 6003.

63.  I have reviewed each of the First Day Motions and the facts set forth there in are true and correct to the best of my knowledge, information and belief.

## CONCLUSION

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.

Dated: July 3, 2020

/s/   Alexis Blair
Alexis Blair

## SCHEDULE I

CONSOLIDATED 30 LARGEST UNSECURED CREDITORS

See attached

## SCHEDULE II

## SUMMARY OF ASSETS AND LIABILITIES

See attached

SCHEDULE III

LIST OF LITIGATION

TO BE PROVIDED IN STATEMENT OF FINANCIAL AFFAIRS

## 30 DAY ESTIMATED INCOME AND EXPENSES

See attached